# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

—————————

m 01-51194

—————————

JUAN G. VILLARREAL,

Plaintiff-Appellant,

VERSUS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

—————————

Appeal from the United States District Court
for the Western District of Texas
(SA-99-CV-1239)

—————————

October 2, 2002

Before HIGGINBOTHAM, SMITH, and
CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Juan Villarreal, an applicant for Social Se-
curity disability benefits ("SSI"), appeals a de-
termination by the Commissioner of Social
Security that Villarreal was not disabled within

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has
determined that this opinion should not be pub-
(continued...)

[*](...continued)
lished and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

the meaning of the Social Security Act. Our review of the record persuades us that Villarreal's claims have been tested by the proper legal standards and that the Commissioner's decision is based on substantial evidence. We therefore affirm.

I.

Villarreal was born July 3, 1960, and was thirty-four years old when he applied for disability payments. He graduated from high school and studied computer science for two years at a junior college. He worked as a seasonal migrant worker from 1975-1988, loading and unloading produce from trucks. He stopped working in 1988 after pulling a muscle.

Villarreal has an extensive medical history and has been examined by many physicians. The earliest event in the record occurred April 15, 1993, when he went to South Texas Rural Health Services complaining of back pain that had begun when he picked up a five-gallon bottle of water. On April 26, 1993, Villarreal was examined by Dr. Gilbert Meadows and complained of a constant low grade achiness in his lower back, but Meadows found no leg symptoms.

Villarreal weighed 277 pounds and exhibited marked back tenderness, but he was able to bend and touch his ankles, and his heel and toe walk was normal. Meadows's impression was a trigger point of the lumbar spine with possible spondylolysis, or dissolution of vertebrae. Villarreal was given prescriptions for Motrin and Robaxin, was recommended a home exercise program, and was told that he should be able to return to work.

On January 25, 1994, Meadows stated that Villarreal had lost about thirty-five pounds and that spondylolysis was apparent from an x-ray. On June 2, 1994, Meadows found that Villarreal had improved and that he was fit for work in the light to medium range with a thirty-pound weight restriction. He gave Villarreal a prescription for anti-inflammatories and muscle relaxants. On October 5, 1994, Meadows stated that Villarreal still exhibited spondylolysis, that his neurologic exam was normal, there were no mechanical findings, and that he was not disabled, and again stated that he was fit for light to medium work with a thirty-pound lifting restriction.

On January 30, 1995, Villarreal was admitted to the hospital. After a number of tests were performed, Meadows formed the impression that Villarreal had progressive neurologic deficit with significant upper extremity weakness, loss of the ability to coordinate muscular movement, and a decrease in cranial nerve function. Dr. Robert Shoumaker, a neurologist, examined Villarreal, noting some weakness in his hands,[2] slight weakness in legs, and that his gait without crutches was "very histrionic." Shoumaker indicated that Villarreal was generally very histrionic and that this was accentuating all the symptoms.

A February 6, 1995, letter from Meadows stated that Villarreal has "some sort of primary neurologic disorder that is severe and probably progressive" but of unknown etiology. On February 17, 1995, Shoumaker examined Villarreal; his EMG evaluation revealed evidence of diffuse and severe denervation in the muscles of the left arm, left leg, and right lower leg. He suggested that these changes

---

[2] Shoumaker, however, specifically noted that Villarreal's effort in hand tests was questionable.

2

were most compatible with a motor neuron disease. Because of some features atypical of motor neuron disease, however, Shoumaker requested a second opinion. His impression was neuromuscular dysfunction and lumbar radiculopathy.[3]

On February 22, 1995, Dr. Carlayne Jackson examined Villarreal. She noted that Villarreal complained that since his injury in April 1993, he had experienced muscle spasms, numbness, and his legs giving out, and that in December 1994 he began to experience bilateral hand weakness that caused him to drop things and had progressed to the point that he required assistance bathing and dressing. In February 1995, Villarreal reported that he had become wheelchair-dependent and that he had lost ninety pounds since April 1993.[4] Jackson noted the possibility of amyotrophic lateral sclerosis ("ALS") but also noted some inconsistencies with that diagnosis. She recommended additional studies to determine the etiology of Villarreal's symptoms.

In April 1995, Villarreal was admitted to the hospital for testing. His progress notes stated, "Mr. Villarreal presents a complex and confusing neurologic picture. On exam, he has findings consistent with B-12 deficiency . . . . However, EMG nerve conduction studies support the diagnosis of motor neuron disease." Hart noted that there was a positive family history for a similar disease and that Villarreal had other indicators of such a disease, including a reported ninety-pound weight loss. His discharge diagnosis was vitamin B-12 deficiency, upper and lower extremity weakness and sensory changes of unknown etiology, and chronic low back pain.

On April 23, 1995, Dr. Dimmette noted that Villarreal had an astasia-abasia[5] gait and that his exam was consistent with ALS. On July 20, 1995, Kenneth Shauger, a neurology resident, stated that Villarreal's disability was "way out of proportion to his weakness, with a strong functional component." He did not believe that Villarreal had ALS; he encouraged Villarreal to engage in physical activity and to discontinue using a wheelchair. On October 26, 1995, Shauger noted a mild distal weakness and atrophy of uncertain etiology but that Villarreal's disability was out of proportion to his weakness, and he should discontinue using a wheelchair.

A residual functional capacity assessment ("RFCA") was performed by a nontreating physician on October 17, 1995. This assessment indicated that Villarreal's exertional limitations were lifting 20 pounds occasionally, 10 pounds frequently, sitting about 6 hours of an 8-hour work day, and standing or walking at least 2 hours in an 8-hour work day. He was limited to occasionally balancing, stooping, kneeling, crouching, crawling, and climbing stairs and

---

[3] Radiculopathy is a clinical situation in which the radicular nerve is compressed by a herniated disk.

[4] It appears unlikely that such a large weight loss actually took place. Though Villarreal indicated that the drop occurred between April 1993 and February 1995, records show that he weighed 279 pounds on April 15, 1993, and 258 pounds on Jan. 26, 1995.

[5] According to Stedman's Medical Dictionary, astasia-abasia is "the inability to either stand or walk in the normal manner; the person affected seems to collapse when attempting to walk, as if to prove that he cannot do so; a symptom of conversion hysteria."

was prohibited from climbing a ladder or scaffold. The RFCA indicated mild limitations in reaching, handling, fingering, and feeling. This assessment was affirmed on January 30, 1996.

On January 25, 1996, Villarreal's progress notes indicate that he was attempting to get a job and had mild distal weakness and atrophy of unknown etiology, with significant functional overlay regarding the weakness and his gait. Further notes from July 11, 1996, indicate similar symptoms but that his disability was out of proportion with the weakness.

In August 1996, Villarreal received a psychiatric evaluation to rule out a conversion disorder. According to this exam, Villarreal participated significantly in the upkeep of his parents' house, and he enjoyed going to the movies and other leisure activities. The doctor noted that Villarreal's gait was characteristic of astasia-abasia and that the psychiatric examination was normal except for Villarreal's gait and did not point to a conversion disorder. It also was not one of the four profiles most commonly obtained from someone with chronic pain.

Dr. Joe Frey, an eye physician and surgeon, prepared a medical impairment evaluation indicating that Villarreal had a disabling undiagnosed or unnamed motor neuron disease and glaucoma. Frey stated that Villarreal's glaucoma had improved with treatment but that he had some loss of visual field.

## II.

Villarreal applied for supplemental security income ("SSI") benefits on January 26, 1995. As to the cause of his disability, he stated that when on April 15, 1993, he bent over to pick up a container of water, a sharp pain hit him,

the lower half of his body gave out, and he fell down. Villarreal stated that his legs had not worked properly since that time. He alleged that he had back problems and weak hands, legs, and knees. His claim was denied initially and again on reconsideration.

A hearing on his claims was held before an administrative law judge ("ALJ"). Villarreal testified that he could no longer cook, change himself, or cut his own meat because his hands shake and that they become numb when he lifts heavy objects so that he loses his grip. During the hearing, Villarreal apparently had an episode in which he ended up out of his wheelchair and on the floor. The ALJ went off the record during the incident. Dr. William Healy, a medical expert, testified at the hearing that he believed that Villarreal met Listing 11.14.[6]

The ALJ determined that Villarreal had mild distal weakness/atrophy and history of glaucoma but not an impairment or combination of impairments equivalent to one listed in Appendix 1, Subpart P, Reg. No. 4. He found that Villarreal was not wholly credible and that there was no indication that his impairments interfered substantially with his activities of daily living. The ALJ rejected

---

[6] Listing 11.14 relates to peripheral neuropathies as a category of impairment and notes that they exhibit "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." Listing 11.04B describes "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Listing 11.00C notes that in assessing the impairment from disorganization of motor function it is necessary to consider the degree of interference with locomotion and/or use of fingers, hands, and arms.

the medical expert's opinion and found that Villarreal retained the residual functional capacity to perform at least sedentary work, that he could not perform his past relevant work, and that based on his age, education, and work experience, 20 C.F.R. 416.969 and Rule 201.27, Table No. 1 of Appendix 2, Subpart P, Reg. No. 4, directed a conclusion of not disabled. The Appeals Council denied his request for review.

Villarreal sued, alleging that the Commissioner's decision was not supported by substantial evidence and that the Commissioner had failed to apply the proper legal standards to his claim. The magistrate judge issued a report and recommendation opining that Villarreal's motion for summary judgment be denied and that the Commissioner's decision denying benefits be affirmed. The district court adopted the report and recommendation, denied the motion for summary judgment, and affirmed the Commissioner's decision denying benefits.

III.

We are limited, in our review of the Commissioner's decision, to considering whether the decision is supported by substantial evidence on the record and whether the Commissioner applied the proper legal standard. *See* 42 U.S.C. § 405(g); *see also Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Such evidence "is more than a mere scintilla and less than a preponderance." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citations omitted).

We may not re-weigh the evidence, try the issues *de novo*, or substitute our judgment for that of the Commissioner, even if we believe that the evidence weighs against the Commissioner's decision. *Id.* "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (citations and internal alterations omitted).

The claimant bears the burden of showing that he suffers from a disability, which the Social Security Act defines as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *Newton*, 209 F.3d at 452. In determining whether a claimant is disabled, the Commissioner employs a five-step sequential evaluation and must decide that (1) the individual is not currently engaged in substantial gainful activity, (2) the individual has a "severe impairment," (3) the impairment meets or equals a listed impairment in Appendix 1 of the regulations, (4) the individual is not capable of performing past relevant work, and (5) the impairment prevents the claimant from doing any other work, taking into consideration residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520; *Newton*, 209 F.3d at 453.

If the claimant presents sufficient proof to satisfy the first four steps, the burden shifts to the Commissioner to prove that the claimant can perform other substantial work in the national economy. *Newton*, 209 F.3d at 453; *Chapparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987). The burden of proof then shifts back to the claimant to rebut the Commissioner's showing. *Chapparro*, 815 F.2d at 1010. The inquiry ends if at any point there is a finding that the claimant is not

disabled. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## IV.

Villarreal argues that the ALJ's decision not to credit medical expert Healy's opinion that he met Listing 11.14, Peripheral Neuropathies, is not supported by substantial evidence and was contrary to Social Security Rulings 96-5p and 96-6p. Villarreal further argues that the ALJ erred in his credibility assessments of the witnesses. Finally, Villarreal asserts that the ALJ's application of the Medical-Vocational Guidelines was erroneous, given evidence of non-exertional impairments.

## A.

Villarreal avers that the ALJ's decision not to credit the medical expert's opinion that he met Listing 11.14, Peripheral Neuropathies, is not supported by substantial evidence. Villarreal asserts that Healy's opinions were not inconsistent with the objective medical evidence, and it was error for the ALJ to disregard them. Villarreal further argues that the ALJ failed to provide a valid rationale for not crediting the medical expert's opinion and disregarding the opinions of treating physicians, in contradiction to Social Security Rulings 96-5p and 96-6p. SSR 96-5P requires the ALJ to provide an appropriate explanation for accepting or rejecting a medical source's opinion, and SSR 96-6P requires an explanation of the weight given to findings of fact by state psychological consultants.

With respect to physical findings, Healy cited the atrophy of the intrinsic muscles of the hand, deltoid, and triceps, and decreased sensory findings to pin prick on the inside of the wrist. Healy indicated that there was a diffuse and undefined but well documented neurologic deficit. He noted that the nerve conductions in the legs were abnormal. He stated that he felt that Villarreal met Listing 11.14 because he did not believe that this was a conversion disorder, though he noted that Villarreal had anxiety reactions as indicated by the episode during the hearing when he hyperventilated. He stated that there were lab and physical findings and two EMG conduction studies that support the diagnosis of upper motor neuron disease, elevated CSF protein, a ninety-pound weight loss, and repeatedly abnormal B-12 levels.

Healy admitted that other doctors had reached conclusions different from his. He also mentioned that Villarreal's grandfather had died at an early age from an unknown neurological illness that had caused him to be paralyzed. Healy recommended "a meeting or equaling with a three year diary"[7] to see whether time would clarify the picture. He admitted that he would not have expected the motor and sensory reflex in the lower extremities to be within normal limits, as Villarreal's were in July 1996.

In weighing Healy's conclusions, the ALJ listed a number of indications from the medical professionals who were skeptical about Villarreal's condition. He noted the psychiatric evaluation did not point to a conversion order and that the MMPI profile was normal, not one of chronic pain. He rejected Healy's opinion that Villarreal met Listing 11.14, noting that Healy based this conclusion on his opinion that Villarreal did

---

[7] This apparently is a recommendation for the ALJ to find that Villarreal's impairment met or equaled a listed impairment under the regulations and that he require Villarreal to keep a diary of his activities to judge his progress or deterioration over time.

not have a conversion disorder.

The ALJ noted that Healy recognized that Villarreal had an anxiety attack at the hearing. The ALJ stated that there was no ninety-pound weight loss shown in the records and that Villarreal's erroneous report on such a subject affected his credibility and called into question the opinions of Healy and of those doctors who relied in part on this reported weight loss in making a diagnosis. The ALJ pointed out that although the psychiatrist had concluded that Villarreal did not have a conversion disorder, she did note that his gait was characteristic of astasia-abasia, which is a conversion symptom.

In discounting Healy's opinion, the ALJ relied on the July 1996 physical findings, which, he stated, showed that motor and sensory function in the claimant's lower extremities were normal. He stated that this contradicted Healy's suggestions but was consistent with other physicians who had examined the claimant and were unimpressed with his illness. He also noted that Healy was a nonexamining medical source and that his opinions were not well supported by medically acceptable clinical and laboratory diagnostic techniques, because there was no objective evidence of significant and persistent disorganization of motor function in two extremities.

Though Healy's opinion was supported by Frey's medical impairment evaluation, the ALJ gave no weight to his opinion that Villarreal had a disabling motor neuron disorder because Frey was an eye physician. The ALJ discounted Frey's opinion regarding Villarreal's alleged motor neuron disorder because Frey was an eye surgeon, not a neurologist, and his opinion was inconsistent with other record evidence.

For example, Shoumaker observed that Villarreal's gait without crutches was histrionic, and Shoumaker suspected a strong functional overlay. He also questioned Villarreal's effort. Dimmette's opinion found that Villarreal did not require a wheelchair, and Shauger opined that Villarreal's disability was out of proportion to his weakness and had a strong functional overlay. All three of these physicians specialized in neurology.

In accordance with SSR's 96-5P and 96-6P, the ALJ provided specific reasons for rejecting the medical expert's testimony that Villarreal met the impairments in Listing 11.14. The ALJ discussed the psychiatric evaluation, noting that the findings were not consistent with those of someone in chronic pain. The ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

When good cause is shown, little weight or even no weight may be given to the physician's testimony. Though we might have accorded more weight to these opinions, "[t]he power to judge and weigh evidence includes the power to disregard, and we must uphold that determination if supported by substantial evidence." *Greenspan v. Shalala*, 38 F.3d 232, 238 (5th Cir. 1994). Substantial evidence supports the determinations of the ALJ, so they survive our review.

B.

Villarreal argues that the ALJ erred in his credibility assessments of various witnesses. He asserts that the ALJ improperly focused on isolated comments of treating doctors regarding conversion and functional overlay, and the 90-pound weight loss, but did not address the psychiatric report that "nullified"

7

these concerns.

Villarreal points to Meadows's notation of a 35-pound weight loss in 1994 to show that a 90-pound loss over two years is not implausible, but that in any case this is immaterial to the disability determination. Villarreal contends that the ALJ gave undue weight to the attack that Villarreal had during the hearing, though there is no discussion of this episode in the record of the hearing. Villarreal did not raise the issue of the ALJ's credibility determination before the district court, so we need not address this issue for the first time on appeal. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

### C.

Villarreal contends that in light of his severe limitations in the ability to balance, bend, crawl, crouch, and operate hand or foot controls as a result of the impairments in his extremities, the ALJ's mechanical application of the grids was erroneous. He asserts that where there are non-exertional impairments, application of the Medical-Vocational Guidelines is error.

"In determining whether the claimant can do any other work, the [Commissioner] considers the claimant's residual functional capacity, together with age, education, and work experience, according to the Medical-Vocational Guidelines set forth by the [Commissioner]." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *see* 20 C.F.R., subpt. P, app. 2. "When the claimant suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines in determining whether there is other work

available that the claimant can perform." *Selders,* 924 F.2d at 618.

The ALJ found that Villarreal's symptoms did not diminish his residual functional capacity to perform the full range of sedentary work. The ALJ noted that Villarreal's impairments could cause some right eye visual field loss and minimal weakness, but found that these symptoms were not to a degree that would prevent all types of work activity. The determinations of the ALJ were based on the substantial evidence presented, and thus reliance on the grids was appropriate.

### V.

In summary, the Commissioner carefully considered the record as a whole and made the determination that Villarreal was not disabled. There is substantial evidence in the record as a whole supporting the ALJ's determinations, and the appropriate legal standards were applied. The judgment is AFFIRMED.